**Andrew GARDNER, Plaintiff,**

v.

**BUFFALO ROCK COMPANY, Defendant.**

Civ. A. No. 80–G–1695–S.

United States District Court, N. D. Alabama, S. D.

Aug. 28, 1981.

Gould H. K. Blair, Birmingham, Ala., for plaintiff.

Clifford M. Spencer, Jr., Pritchard, McCall, Jones, Spencer & O'Kelley, Birmingham, Ala., for defendant.

MEMORANDUM OPINION

GUIN, District Judge.

This cause of action, couched in terms of a Title VII employment discrimination suit, arises out of an incident in October 1976 at which time the plaintiff, Andrew Gardner, was either laid off or dismissed as a truck driver for the defendant, Buffalo Rock Company. The plaintiff contends that he was laid off and that the defendant refused

to recall him all because of his race and that the defendant replaced him by a white male in violation of both 42 U.S.C. § 2000e and company policy concerning layoff and recall. The defendant asserts that the plaintiff was dismissed for violation of the company rule prohibiting carrying passengers in company vehicles.

After reviewing the testimony presented at trial, the submissions of counsel and applicable law, the court concludes that the company originally laid off the plaintiff, hired a white male to replace him, after receipt of the EEOC charge "terminated" the plaintiff, and that the contention that the plaintiff was fired for violating a company rule is merely a pretense. The court therefore concludes that judgment is due to be granted in favor of the plaintiff, for the reasons stated herein.

The plaintiff, a black male, began working for the defendant in May 1975 as a permanent over-the-road transport driver and continued in that position until October 18, 1976. On that date, the plaintiff contends he was laid off. The defendant, on the other hand, contends that the plaintiff was discharged for violation of a company rule. Not in dispute is the fact that on or about November 11, 1975, the plaintiff and other transport drivers signed a copy of the company rule which prohibits the transportation of passengers in company vehicles. The rule itself specifies that any violation would result in immediate dismissal. It is this rule which the defendant claims Gardner violated. The plaintiff admits that he signed the rule and admits that prior to November 1975 he twice carried passengers in his truck, but denies that he violated the rule any time around October 1976.

Two witnesses for the defendant, Jimmy Wolfe and William Stewart, testified that a few days before October 18, 1976, Gardner was seen letting a female passenger out of his truck on Interstate 65 near the Valley Avenue overpass in Birmingham. Jimmy Wolfe, vice-president of Buffalo Rock who

is in charge of hiring and firing, testified that, when a violation of this rule is communicated to him, his policy is to immediately investigate the charge and that only three or four days usually intervene between notification of a violation and dismissal of the employee. He further stated that company policy required that information regarding a violation be placed in the employee's personnel file.

William Stewart, safety director at the time, testified that he saw a female get out of Gardner's truck on the interstate near the Valley Avenue overpass and that he related such to Jimmy Wolfe. Although Mr. Stewart stated that he had no independent knowledge of when this event took place, based on a note he saw in Gardner's personnel file, he thought it was in October 1976.[1] Further, Stewart testified that Wolfe did not tell him what action he would take, or did take, concerning Gardner, but that it became common knowledge around the plant that Gardner had been fired.

The plaintiff contends that Stewart and Wolfe were confused as to when and under what circumstances Gardner had been seen with passengers in his truck. Gardner testified about two occasions—both well prior to October 1976—on which he had picked up passengers. The first incident occurred around June 1975, when he aided a lady who had car trouble in the middle of the interstate. She subsequently wrote a letter to Mr. James C. Lee, president of the company, in which she expressed appreciation for Gardner's help. Lee read the letter to Gardner and commended him for his actions. The second incident related by Gardner occurred around August 1975 when he picked up a Bowman truck driver who had automotive problems. Gardner let him out on Interstate 65 near the Valley Avenue overpass so that he could climb over the fence and get to a nearby shopping center where another Bowman truck driver waited.

---

1. It is interesting to note that, as will be discussed later, there is no notation in Gardner's personnel file with an entry date in October 1976 relating to the described incident, although there is such an entry dated October 30, *1975.*

Gardner's personnel file supports neither version.[2] Mr. Wolfe testified that he viewed carrying passengers in a company vehicle as a serious violation which would have resulted in virtually immediate termination. He also stated that company policy required that such a violation be noted in an employee's personnel file. Mr. Gardner's file, however, contains no record of any occurrence similar to the incident described by Wolfe and Stewart in or around October 1976. The notation entered closest to October 18, 1976, is dated September 27, 1976, and references information from "Pepsi Montgomery" to the effect that Gardner had a passenger in his truck when making a delivery to that plant. Clearly, this incident does not fit the description of the violation given by Stewart and Wolfe. The report next closest in proximity to the plaintiff's last day of employment bears a July 12, 1976, entry date. This entry states that Gardner was seen with someone in his truck and was warned about carrying passengers. The only other notation in the plaintiff's personnel file which refers to having a passenger in his truck reads "warned about picking up hitch hikers" and bears the date of October 30, 1975—a year before he was terminated.

These last two entries may well refer to the two incidents Mr. Gardner admitted came to the attention of Wolfe. The entry concerning the report from "Pepsi Montgomery" not only predates plaintiff's alleged dismissal by almost a month but also does not contain allegations similar to those to which Wolfe and Stewart testified.

Not only do the entries in the personnel file not match the dates and facts described by Wolfe and Stewart, the file does not contain a termination slip on Gardner. Testimony indicated that it would have been standard company procedure to prepare a termination slip on Gardner and such would have been kept in the personnel file. The conspicuous absence of such an important document increases the doubt already raised as to whether the defendant actually fired Gardner in October of 1976.

The court concludes that it is highly unlikely that the event described by Wolfe and Stewart took place in October of 1976— if it occurred at all. There is absolutely no documentation of such an event being the basis of plaintiff's dismissal or of the plaintiff's alleged dismissal, and the court finds that the evidence does not support the defendant's attempt to justify the termination of plaintiff's employment. To the contrary, the evidence weighs heavily in favor of the plaintiff's contention that he was laid off, not terminated, in October 1976.

Other documentary evidence besides the personnel file supports the argument that Gardner was laid off. For example, only a few days after the plaintiff's last day of employment with the defendant, Gardner applied for unemployment compensation. On that application, Gardner indicated that he had been laid off. The Alabama Unemployment Compensation Agency notified Buffalo Rock of the application for the purpose of verifying wages and the reason for termination. Mr. Wolfe, to whom the notification was sent, did not reply although he testified that it was his practice to see that an application for unemployment compensation reflects accurate information. In light of Wolfe's statement that he considered carrying passengers in a company vehicle a serious violation, and the fact that unemployment compensation payments affect the unemployment tax rates of the employer, as well as the fact that an employee terminated for cause would be disqualified for compensation for at least two to six weeks, the court finds that Mr. Wolfe did not correct Gardner's application because it correctly reflected that he had in fact been laid off.

Another piece of demonstrative evidence which supports the plaintiff's claim is the charge filed with the EEOC by Gardner.

**2.** The defendant confined its proof justifying termination to the one incident about which Wolfe and Stewart testified so that, even though the file contains references to various complaints made against the plaintiff, any other grounds which might have justified dismissing the plaintiff are irrelevant to this case.

Throughout his three-page complaint, Gardner charges that the company laid him off and failed to recall him because of his race, and that he had been replaced by newly-hired white drivers. A copy of that complaint was sent to Buffalo Rock. On the same day notification of the charge was received, James C. Lee, president of Buffalo Rock, responded by letter in which he merely denied the charge of discrimination. Mr. Lee sent a second letter to the EEOC about a month later in which, for the first time, he stated that Gardner had not been laid off but was in fact discharged. Mr. Lee cited customer reports that Gardner had violated the company rule as the reason for discharging Gardner.

Lee testified that he had received a photocopy of the EEOC complaint, and that he was aware of the existence of the written company rule and of Gardner's discharge at the time he wrote the first letter. If Lee were aware of such matters when he first responded to the EEOC charge, why did he not respond accordingly? Instead, he made no mention of the company rule; nor did he dispute that Gardner had been laid off instead of fired.

A final piece of documentary evidence which lends credence to Gardner's testimony that Wolfe told him he was laid off is the verification of income form, a part of the plaintiff's application for food stamps. This one document created a small furor at trial. Offered to rebut Wolfe's testimony that he would never have signed information he knew to be false and would never have signed a statement that Gardner had been laid off instead of fired, the document states that Gardner was "Layed off," and is subscribed with what appears to be Jimmy Wolfe's signature. Wolfe admitted that the signature looked like his but did not recall ever signing such a document. Much was made of the fact that two distinctively different handwritings appear on the face of the document, and of the fact that Gard-

ner repeatedly stated that Wolfe filled out the entire form in his presence. The court is not persuaded that these two facts support the defendant's assertion that the document was forged. Common sense as well as the evidence presented require a different conclusion. It is highly likely that Wolfe did fill out all of the form that Gardner saw actually completed in his presence. Further, as Mrs. Mildred Gilbert, from the food stamp department of the Department of Pensions and Security testified, it would not be unusual for a case worker to fill in some of the information on the form. All that was required of the employer was his signature. Although the defendant tried to persuade the court that "layed off" was not written by Wolfe, the court finds that there are sufficient similarities in the writing on the form and Wolfe's known handwriting to conclude that it is more likely than not that both the signature and "layed off" were written by Wolfe.[3] In addition, Gardner had absolutely no reason to present a forged document in order to receive food stamps. Mrs. Gilbert testified that it made no difference at all whether an applicant had been fired for cause or laid off. Furthermore, it would take an expert forger to so closely duplicate the handwriting of Wolfe and it is highly unlikely that Mr. Gardner has such a skill. The court therefore concludes that Wolfe did in fact sign the verification of income form and did in fact write "layed off" on that form, further evidencing that the plaintiff was laid off and not discharged.

Overshadowing this entire case and lending support to his contentions is the plaintiff's genuine sincerity and persistent conviction that he was laid off and not fired. The deeply sincere manner Mr. Gardner displayed at trial impressed the court, as well as the fact that Mr. Gardner repeatedly stated that he had been laid off on various applications after his employment with Buffalo Rock ended. Gardner also testified

---

**3.** The court required Wolfe to write "laid off" in order to compare the handwriting. Although Wolfe spelled "laid off" correctly, he did have five years in which to learn how to spell. While the court does not profess to be a handwriting analyst, the similarities between the known handwriting and the questioned writing are sufficient to justify the conclusion that they were written by the same hand—the hand of Jimmy Wolfe.

that he called Buffalo Rock every two weeks about being recalled. These actions are not those of a man who had been terminated. While Wolfe may have intended to discharge the plaintiff, he undoubtedly did not tell Gardner that he was fired.

The plaintiff's actions subsequent to October 1976, his sincerity and the circumstantial evidence already discussed combine to convince the court of the truth of plaintiff's complaint. In deciding to accept the plaintiff's account and reject the defendant's story, the court does not find that the defendant's witnesses and employees told anything less than the truth as they may recall it. It should be remembered that virtually all who testified were interested witnesses; the plaintiff obviously is interested in the outcome of this lawsuit, as are Wolfe and Stewart, who are employed with Buffalo Rock and who have an interest in keeping those jobs; Lee is president and a principal stockholder. Also, five years have elapsed since the events occurred about which the witnesses testified. In October 1976, whether Gardner was fired or laid off probably mattered little to Buffalo Rock, although such was of immense importance to Gardner whose livelihood was at issue. Therefore, the court finds that it is much more likely that Gardner would correctly remember the details of his conversations with Wolfe, Lee and others regarding his discontinuation of employment with Buffalo Rock.

Based on the above conclusions concerning the evidence presented, the court finds that the plaintiff met his burden of showing racial discrimination. While this case does not fit precisely within the elements of a prima facie case as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiff sufficiently established his prima facie case by showing (1) that he belongs to a racial minority; (2) that he was qualified for the job which he held; (3) that he was laid off or terminated without cause; and (4) that he was replaced by white employees. The plaintiff further succeeded in showing that the proffered reason for allegedly discharging the plaintiff was a mere pretext. As stated by the Supreme Court, the plaintiff may succeed in proving intentional discrimination by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. In this case, Gardner successfully showed that too many inconsistencies exist between the actions of the defendant's officers and their testimony, casting serious doubt upon the genuineness of the proffered justification.

At the trial the parties stipulated as to the damages allowable in the event the plaintiff succeeds. Having determined that judgment is due to be granted in favor of the plaintiff and against the defendant, the court accepts the amount of damages as stipulated, exclusive of costs and attorney's fees.